CITY OF PHILADELPHIA v. WELSBACH STREET LIGHTING CO.
OF AMERICA.

(Circuit Court of Appeals, Third Circuit.    January 2, 1915.)

No. 1854.

1. MUNICIPAL CORPORATIONS (§ 250*)—CONTRACTS—CONSTRUCTION BY CITY
   OFFICER PURSUANT TO CONTRACT.

   A city invited bids for furnishing street lamps, submitting with the invitations specifications and instructions to bidders, which were made a part of the contract with the successful bidder.   Such instructions stated that, if a bidder was in doubt as to the meaning of the specifications and accompanying papers, he should notify the director of public works, who would send a written instruction to all bidders, and that any doubt as to the meaning of the specifications would be explained by the director, and any directions required to complete any of the provisions thereof given by the director.   The specifications provided, relative to tests at intervals of the illuminating power of the lamps, that the tests should be made with the clear glass globe inclosing the lamp removed.   In response to an inquiry from the successful bidder, the director prior to the execution of the contract advised the bidder in writing that lamps showing average conditions would be selected for the tests, that the contractor should have notice and an opportunity to check the results of the tests, and that any depreciation of the mantle or change in the adjustment of the burner occurring during transportation to the place of test should be corrected before the test was made.   *Held*, that under the contract this interpretation by the director was an interpretation of the specifications by the city itself, which it was estopped to deny, and hence, in an action on the contract, the admission of such interpretation was not error, as varying the terms of a written contract, especially as the interpretation had slight, if any, probative force, the statement as to depreciation of the mantle or change in the adjustment of the burner being nothing more than an interpretation of which the contract itself was susceptible, while the implication that the lamps would be moved in making the tests was rendered unimportant; the city, on the occasions when tests were made with the lamps in place, having clearly broken the contract by making the tests without removing the globes.

   [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 688–691; Dec. Dig. § 250.*]

2. MUNICIPAL CORPORATIONS (§ 255*)—CONTRACTS—ACTIONS—SUFFICIENCY OF
   EVIDENCE.

   In an action on a contract with a city to furnish street lamps and maintain them at 60-candle power, with a provision for deductions from the contract price if the average illuminating power as ascertained by tests to be made by the city was less than the agreed power, proof that each lamp before it was installed in place was tested and possessed the required candle power made a prima facie case for the contractor, as knowledge whether the contractor had maintained all the lamps at the required candle power was within the possession of defendant, and only upon that knowledge as derived from its tests was it required to make payments.

   [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 701; Dec. Dig. § 255.*]

3. MUNICIPAL CORPORATIONS (§ 253*)—STREET LIGHTING CONTRACTS—METHOD
   OF TESTING LAMPS.

   Under a contract to furnish street lamps, providing for deductions from the contract price if the average illuminating power was less than 60-candle power, and providing for a test by selecting a number of lamps from those in use and determining their illuminating power, the average candle power of the lamps so tested to constitute the basis for calculating the

light furnished during the month, and further providing· that in making the test the burner complete, with mantle and chimney, should be used, but that the clear glass globe inclosing the lamp should be removed, deductions could not be based upon tests made by the city without removing the globes, and, in an action on the contract, evidence as to the results of such tests was properly excluded; it not appearing that tests with the globes removed were impossible.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 695; Dec. Dig. §·253.*]

4. APPEAL AND ERROR (§ 882*)—INSTRUCTIONS—HARMLESS ERROR.

In an action on a contract to furnish street lamps, providing for deductions from the contract price if the average illuminating power as ascertained by tests should be below 60-candle power, where the monthly statements of· deductions rendered by the city to the contractor, and introduced by the city, referred to such deductions as penalties, and the whole controversy revolved around these statements and the methods by which they were reached, the court's use of the words "penalties" and "penalize" in referring to such deductions was not prejudicial, though they were not, strictly speaking, penalties, as the jury was as familiar as the court with the descriptive words employed by the city, and must have understood the court's use of such words.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3591–3610; Dec. Dig. § 882.*]

In Error to the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Action by the Welsbach Street Lighting Company of America against the City of Philadelphia. Judgment for plaintiff, and defendant brings error. Affirmed.

This is an action in assumpsit on a written contract, whereby the plaintiff below engaged to furnish and maintain at a given illuminating power for a specified period a certain number of incandescent naphtha lamps, and the defendant below promised to make payment therefor at a stipulated rate. Preliminary to the execution of the contract were negotiations between the parties which have an important bearing upon the questions in controversy.

In September, 1912, the city of Philadelphia, through its chief of the bureau of lighting, department of public works, invited the plaintiff, Welsbach Street Lighting Company of America, and other companies, to submit proposals to furnish and maintain incandescent mantle lamps burning naphtha or other illuminating oil for lighting certain of its public streets during the year 1913. This invitation was in writing and was accompanied by printed instructions to bidders and specifications under which the proposals requested were to be submitted. The instructions to bidders contained a clause to the effect that, should a bidder be in doubt as to the meaning of a specification, the director, upon notification, would send a written instruction to all bidders respecting the same. A similar provision was contained in the specifications.

On September 20, 1912, pursuant to these instructions, the Welsbach Company wrote the director of public works that it was in doubt as to the meaning of certain specifications, and requested his written explanation and interpretation of them, in time for consideration before submitting proposals. The director replied on September 21st, answering in writing the inquiries made by the company.

Based upon the specifications, as in part interpreted by the director, the company, on September 24th, submitted five separate proposals for furnishing naphtha lamps, in accordance with the specifications, each proposal covering one of the five lighting districts into which the city was divided, at the rate of $29 per lamp per year.

On December 31, 1912, a written contract was executed between the city and the company, whereby the company agreed to furnish and maintain lamps

of the type, candle power, and number prescribed by the specifications and proposals attached to the contract, for the consideration therein set forth. Under this contract, 18,222 naphtha lamps, containing their own fuel and being fed automatically, were supplied by the company and distributed among the five lighting districts of the city, for the illumination of streets and alleys which were not reached by gas mains.

The total amount of the bills for the first six months of the contract year of 1913, rendered by the company to the city, less credits allowed, was $274,976.08. This sum was estimated upon the number of lamps furnished at the candle power required. The city paid the company $221,813.52, and deducted from the total of the bills rendered and withheld from payment the sum of $53,162.56, upon the contention that the lamps supplied were deficient in the candle power contracted for to the extent represented by the amount of the deduction.

According to the terms of the contract, as disclosed by the specifications which the contract embraced, the rate at which the city was required to pay for light was apportioned to the candle power of the light supplied, based upon a minimum of 60-candle power for each lamp, and the power of the light supplied was determined according to a method of test agreed upon, the specifications respecting which are as follows:

"8. Tests of Lighting Furnished.—Lamps will be tested photometrically as to actual street illuminating power as described, and the minimum illuminating power they shall be required to furnish on the street at all times under the conditions herein specified will be sixty (60) candle power.

"9. Method of Test of Lantern.—The city shall have the right at any time to test the quality and illuminating power of the lamps and lights as furnished on the street, and for that purpose at least twenty-five (25) lamps may be selected from those in actual use in each district, by the director, in each and every calendar month, and their illuminating power shall be determined photometrically by him by horizontal measurement, using any method sanctioned by standard practice, at the city's photometric station, or elsewhere, at his discretion. The average candle power of the lamps so tested shall constitute the basis for calculating the light furnished by the lights burning during the month and for which the charge is made. The contractor may have a representative present both when the lamps are selected and at the tests.

"The term 'lamp' herein means the burner, complete with mantle and chimney, if any, as found set up for use in any of the streets or public places, and the test herein referred to shall be made with the clear glass globe which incloses the lamp on the street removed, but otherwise under the same conditions as exist when the lamp is taken down; the object of the test being to determine that the actual illuminating power, as contracted for, is given on the street. Each lamp shall be tested with the illuminating material contained in the lamp when taken down.

"10. Failure to Deliver Required Candle Power.—If the average candle power of these twenty-five (25) lamps falls below the minimum candle power required by these specifications, then the contractor shall receive as full payment for that month the proportion of the total amount otherwise due him that the average candle power obtained in the tests bears to the minimum required candle power."

At the time the contract was made there were two city testing stations, both equipped with photometric apparatus for the measurement of the candle power of naphtha lamps, according to a standard method of measurement then pursued. On January 20, 1913, the acting chief of the bureau of gas wrote the Welsbach Company that he had determined to make the test of lamps on the streets with the lamps *in place* stating: "We prefer to make this test with the glass housings on, although the contract states, 'and the test herein referred shall be made with the clear glass globe which incloses the lamp on the street *removed*.' We understand, however, that this provision may be waived by the written agreement of both parties, and we therefore propose to you that in the interest of fairness to both sides, the measurement of the lamps be made with the glass housings on. We recognize

that a correction should be made for the absorption and reflection of the glass of the housings, and we propose to obtain the value of this correction by means of a study of the net loss of light due to the housings—this study to be made of one hundred glass housings of the type used on the lamps. We propose to use the average correction thus obtained in calculating the candle power, not only of the lamps tested in January, but also of each lamp tested throughout the year."

The company declined to consent to any change in the method of testing from that prescribed by the specifications, and explained to the chief of the bureau of gas its idea of the inaccuracy and unfairness of the proposed method. Notwithstanding the refusal of the company to consent to the proposed change of method of test, the director of the department of public works tested 125 lamps in January and 125 lamps in February, in accordance with the method suggested by the chief of the bureau of gas, and in each instance the test was made without taking the lamp from the post or removing it to a testing station, and without removing the glass globe from the lamp.

One hundred and twenty glass globes were then taken from lamps in the street and tested to ascertain their average quality of absorbing light. After determining that these 120 globes on an average would absorb 13.4 per cent. of light, the lamps in January and February were tested with the globes in place, that is, not "removed," and to the candle power thus ascertained was added the theoretical quantity of 13.4 per cent. of light absorbed by the globe, and the total was estimated as the illuminating power of the lamp and made the basis upon which the city made and withheld payments. At the trial, objection was made to the evidence of the tests made in January and February with the globes on and with the theoretical allowance for light absorbed by the globes added. The objection was sustained, and all evidence of this method of test excluded.

In March, April, May, and June, the city used for testing lamps a portable photometer, which consisted of an automobile truck equipped with a bar photometer and other photometric apparatus inclosed by side and top curtains, which was taken to positions near the lamps to be tested, and lamps were tested in three ways: First, with the same apparatus used in January and February and with the globe in place; second, the lamp was taken down from the post and put in the portable photometer and tested with the globe in place; and, third, the lamp was tested in the portable photometer with the globe removed.

All the deductions made by the director from the amounts of the bills rendered by the company for the first six months of 1913 were based on readings of the lamps tested on the posts with the globes *in place*. When the evidence of these tests was excluded, the city was left without tests for January and February on which to base deductions, and was obliged to recalculate the deductions for the other four months on the basis of the readings made in the portable photometer with the globes removed. These latter readings were disclosed for the first time at the trial of the case, and the new calculations were made by one of the witnesses during the progress of the trial, and admitted in evidence.

Edgar W. Lank, of Philadelphia, Pa., for plaintiff in error.

John G. Johnson, of Philadelphia, Pa. (R. Stuart Smith and Charles E. Morgan, both of Philadelphia, Pa.), for defendant in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge (after stating the facts as above). The errors assigned in the trial of this cause are 22 in number, extending to rulings of the court upon matters of evidence and to the charge to the jury, the substance of which, when classified, is as follows:

(1) Admissibility of letters between the parties prior to the execution of the contract.

(2) Proof by the plaintiff of the performance of its part of the contract.

(3) Admissibility of evidence of the tests of lamps made by the method employed during the months of January and February.

(4) The charge of the court under the prayers of both parties as to the tests of lamps made by the method used in the months of March, April, May, and June.

(5) The prejudicial effect of the use of the terms "penalty" and "penalize" in the charge of the court.

[1] 1. When the Welsbach Company was invited by the city, through its department of public works, to submit proposals for lighting its streets by incandescent lamps, there accompanied the invitation "specifications" of the proposed contract and "instructions to bidders." The former contained in the usual form the particulars and details of the matter contemplated by the contract into which the company was invited to enter, and the latter contained directions and instructions, intended to guide or instruct bidders with relation to the subject-matter to which their bids were invited. Among the instructions in the two instruments are the following:

"Should a bidder find discrepancies in or omissions from the specifications and accompanying papers, *or should he be in doubt as to their meaning*, he should at once notify the director, who will at once send a written instruction to all bidders. The city will not be responsible for any oral instructions." Instructions to Bidders, section 3.

"Any doubt as to the meaning of the specifications or any obscurity as to the wording of them, will be explained by the director, and any directions which may be required to complete any of the provisions of the specifications will be given by the director." Specifications, section 13.

Entertaining a doubt as to several phases of the specifications, especially concerning the method of test prescribed, the Welsbach Company, before submitting its proposals, or in other words before making its bids, obeyed the instructions adverted to, and wrote to the director of public works asking his interpretation thereof. To this inquiry the director made a written reply, the substance of which was:

(a) That in selecting 25 lamps from any district for test, his selection should be of lamps showing average conditions throughout the district.

(b) That the contractor should have timely notice of the time and place when lamps should be selected and tested, and that the representative of the company would be permitted to check the standards, adjustments, and readings.

(c) That any deterioration of the mantle, or change in the adjustment of the burner, occurring during transportation of the lamp from the street to the place of test, should be corrected before the test is made, so that the test should be of the lamp in the same condition as when in operation on the street, but suggested that 2 or 3 extra lamp tops, in addition to the 25, be taken to the place of test as substitutes, in case one or more of the 25 became disarranged.

These letters were offered and admitted in evidence over the objection of the city that in effect they altered and varied the terms of the written contract afterwards entered into and now in suit.

There must be eliminated from the consideration of the question raised any idea that in this correspondence there existed or was attempted anything in the nature of private negotiations between a bidder and a municipal officer, thereby removing the question from the law and the cases pertaining to such a transaction. This correspondence was inaugurated, conducted, and concluded upon the invitation and within the purpose of formal instructions to bidders, prescribed therefor by the city itself. Its subject-matter did not contemplate nor did it effect a change or alteration of the terms of the specifications as made. The correspondence extended merely to an interpretation of terms concerning which the bidder had a doubt, which, when existing, it was the desire of the city to remove by the method suggested and pursued, thereby obviating misunderstandings between parties, and avoiding subsequent litigation.

The reply of the director of public works, in giving his interpretation of that part of the method of test concerning which the company had a doubt, did not describe or establish any precise test, either by reciting the test contemplated by the specification or by suggesting another. It contained, however, an implication that the lamp, with the mantle and the burner, would be removed from the post and transported from the street to the place of test, and the place of test would be at the "city's photometric station or *elsewhere*," at the director's discretion. As to the location of the place of test, whether proximately or remotely distant from the lamp in place, the correspondence added nothing to nor withdrew anything from the specifications. There is, however, in the letter of the director an implication that before test the lamp would be *moved* to the place of test. The implication that the lamps would be removed before tests acquired an importance, in view of the fact that the January and February tests were made with the lamps in place; but the importance of this implication was lost in contemplation of the other fact that in the January and February tests the city clearly violated an undisputed provision of the contract by making tests without removing the globes. In other words, the city committed a breach of its contract in January and February, when it made tests of lamps without removing the globes, an act to which the correspondence in question did not extend, making unimportant the question raised by the correspondence whether the tests should be made with the lamps in place or should only be made after the lamps were removed. The remaining representation of the director that, when a lamp was transferred from the post to the station, allowance would be made in the test for deterioration in the mantle or change in the adjustment of the burner, occurring upon removal, was nothing more than an interpretation of which the contract itself was susceptible without the aid of the director's interpretation; the sole object of tests being to ascertain the candle power of the lamps, not when tested, but when in operation upon the streets. It occurs to us that the interpretation made by the director of the specifications to which the company addressed its inquiries has a very slight probative bearing, if any, upon the issues as they subsequently developed. Nevertheless they were admitted in evidence, and their admissibility has been challenged.

The letter of the company contained inquiries made upon invitation by the city. That invitation was embraced within the instructions to bidders and specifications, and the instructions to bidders, as well as the specifications, were embraced within and attached to the contract, and made a part thereof. The reply by the director to the inquiries made was an interpretation which the city required the director to make, under the method which the city had adopted to instruct bidders as to what it meant by its specifications, and having adopted this method of giving interpretations to doubtful expressions in specifications, before those specifications became a contract, the interpretation by the city's officer became an interpretation by the city itself, the meaning of which it is estopped to deny, and of the effect of which it cannot complain.

We do not hold that every interpretation by a municipal officer binds the city, even under circumstances where the city has volunteered the interpretation of its employé; but under the circumstances of this particular case, to which the expression of our opinion is restricted, which involve a change by the city from a method of test prescribed by the contract, first, to a method plainly different from that contemplated, and then, second, to a method the similarity of which to the one prescribed is challenged, we believe the city is bound by the act of its director, and the correspondence objected to was properly admitted in evidence.

[2] 2. By the terms of the contract the plaintiff agreed to furnish about 18,000 lamps and to maintain the same at 60-candle power. In proof of performance, the defendant introduced evidence that, before each lamp of that considerable number was supplied and installed in place, it was tested and proven to possess the required candle power. It is contended on the part of the city, however, that while this may be proof that the lamps of the required candle power were furnished, it is not proof that the required candle power was maintained. We are of opinion that by the testimony offered the company prima facie has supported the burden placed upon it. This view is aided by an unmistakable inference from the contract, that when it entered into the contract the city recognized the difficulty, if not the impossibility, of the company testing each one of the 18,000 lamps at different periods of each month in order to establish its right to receive or recover payment for maintaining the same at 60-candle power. Therefore the city and the company, in their contract, agreed that, for the purpose of ascertaining the quality and illuminating power maintained in the lamps, the city should select and test 25 lamps from the total in actual use in each district in each month, and that, if the average candle power of the 25 lamps selected and tested fell below the minimum candle power required by the specifications, then the company should receive as compensation for its lighting service in that district an amount decreased in proportion to the deficiency disclosed by the tests. Upon the plan thus agreed upon, knowledge whether the plaintiff had maintained at the required candle power all the lamps in each district for the whole of a month was within the possession of the defendant, and only upon that knowledge, as derived from its tests, was the city required to make

payments. We are of opinion that the plaintiff prima facie established its right to recover.

[3] 3. At the trial of this cause the defendant offered evidence of tests made during the months of January and February, holding that the same were in accordance with the specifications of the contract. Without reference to the interpretation placed upon the specifications by the director, previously considered, the specifications provide for a test of the lamps furnished under the contract, by selecting 25 lamps from those in actual use in each district in each month, and their illuminating power, determined photometrically by "any method sanctioned by standard practice at the city's photometric stations or elsewhere," at the director's discretion. The specifications provide, further, that "the average candle power of lamps so tested shall constitute the basis for calculating the light furnished during the month," and that the term "lamp" means "the burner, complete with mantle and chimney, * * * as set up for use in the street, and the tests * * * shall be made with the clear glass globe which incloses the lamp on the street *removed,* but otherwise under the same conditions as exist when the lamp *is taken down;* the object of the test being to determine that the actual illuminating power, as contracted for, is given on the street."

During the months of January and February of the year of the contract the city made its tests without taking the lamp down from the post or removing it to a testing station, and *without removing* the glass globe. In other words, the method pursued during the months of January and February was to test the lamp in place with the globe in place. Recognizing that a lamp which gave a light of 60-candle power without the globe would show appreciably less candle power with the globe in place, due to the absorption of light by glass, the city made a test of 120 lights to determine the average percentage of light absorption by the globes, and ascertained the same to be 13.4 per cent. To the candle power ascertained by test of a lamp in place inclosed by a globe, the city added the estimated percentage of light absorption by the globe, and the two together were computed to represent the candle power of the lamp, upon which the city based its calculations, and made and withheld its payments to the company. Evidence of tests of this character was offered, upon the claim that tests with globes removed, as provided by the contract, were impossible, and therefore tests with the globes in place, being the only method found possible, were permissible. Such did not appear to be the fact, and the trial court, in our opinion, properly excluded testimony of tests by the method followed, upon the ground that they were made by a method in complete conflict with and wholly different from the one agreed upon in the contract.

4. The method of the tests employed by the city during the months of March, April, May, and June differed radically from the method employed during the months of January and February. In these months the city used a portable photometer, which was moved or conveyed to the lamp. It consisted of a photometric apparatus inclosed in curtains. During this period, tests were made in three ways: First,

with the same apparatus used in January and February with the globe in place; second, the lamp was taken down from the post and placed in the portable photometer and tested with the globe in place; and, third, the lamp was tested in the portable photometer with the globe removed.

The results of these tests demonstrate to a certainty the inaccuracy either of the method pursued in January and February or of the one pursued in the months following. In the latter months, tests were made of the same lamp by both methods. Among the reports of these tests, as shown by the testimony of the city, appears a test of one lamp made first by the early method with the globe on, yielding 35.4-candle power, to which was added the 13.4 per cent. candle power estimated to have been absorbed by the globe, and the two together were reported as showing 40.9-candle power. But when the same lamp was tested by the portable photometer under the method of the latter months, with the globe removed, instead of yielding 40.9-candle power, or precisely the same as the total of the two items that comprise this figure, it yielded but 16.02-candle power. This variation was extreme. The variations in the scores of tests of other lamps were not so wide as in this one, but variations existed in all, and in none did the test with the globe removed correspond in candle power with the test made with the globe on plus the estimated light absorbed by the globe.

Evidence of the tests made in January and February having been excluded by the court, the city offered, and the court admitted, evidence of its tests made by the method employed in March, April, May, and June. The company contended that according to the specifications the tests were not only to be made with the globes removed, but were to be made under conditions equivalent to those which prevailed in a laboratory, maintaining that a very slight difference in temperature of a burner, caused by a draft of air, would change its light-giving properties; that the testing apparatus of the portable photometer was protected only by loose curtains; that it was productive of drafts and currents of air, which seriously impaired the efficiency of the naptha burner while under tests with the globe removed; and that the apparatus employed was one not contemplated by the contract, that it was not a standard method, and was merely an experiment in photometry. On the other hand, the city contended it was not restricted to making tests in photometric stations, but under the terms of the specifications could make them at "the city's photometric stations or *elsewhere*"; that the photometer used, though portable, was of a character contemplated by the contract; that it produced accurate results, and the method followed was sanctioned by standard practice. As the contract required the tests to be made by "any method sanctioned by standard practice," "at the city's photometric stations, or *elsewhere*," the trial court submitted to the jury the question whether the method followed was the one contemplated by the contract, and also whether the tests made upon the device employed were pursuant to a method sanctioned by standard practice. We find no error committed by the court in submitting these questions to the

jury, either in what its charge contained or omitted. The issue was clearly and fully submitted to the jury, and by the jury was decided.

[4] 5. In the charge to the jury the court alluded to the deductions made by the city from the bills presented by the company as "penalties." The word appears in several places in the charge. Strictly speaking, the deductions made by the city were not penalties, and the effect of making the deductions was not to "penalize" the company. If there existed in the case nothing to indicate why the court used these words, we might think the minds of the jurors might have been influenced and prejudiced by them. But in charging the jury the court was not using technical terms with their legal meanings. It was employing terms which had been introduced into the case by the city itself, and which had first been used by the city in rendering its monthly statements to the company of the deductions made, to which deductions it referred as "penalties." Each notice or letter conveying information of the amounts deducted contained a table, which was described as "a statement of penalties by districts." Around these statements and the methods by which they were reached revolved the whole controversy in the case, and very naturally the court drifted into using the descriptive words employed by the city. With these words the jury was quite as familiar as the court, and when they were used by the court the jury knew what they meant and to what they alluded, and therefore could not have been prejudiced by them.

We find no error in the trial below, and affirm the judgment.